# PERRINE'S EXECUTORS *vs.* PERRINE.

[BILL IN EQUITY BY WIDOW, FOR ALLOTMENT OF DOWER AND RECOVERY OF RENTS.]

1. *Widow's right to back rents not forfeited by occupation of husband's dwelling-house.* If the widow occupies her husband's last dwelling-house until her dower is assigned, under the privilege secured to her by statute, (Clay's Digest, 178, § 7 ; Code, § 1359,) she does not thereby forfeit or impair her right to recover one-third of the rents and profits which accrued during the continuance of her possession from the other lands subject to her dower.

APPEAL from the Chancery Court at Mobile.

Heard before the Hon. WADE KEYES.

THE bill in this case was filed on the 11th November, 1857, by Mrs. Lucy N. Perrine, against the executors, devisees and heirs-at-law of her deceased husband, James Perrine ; and sought an allotment of her dower in the real estate of which her said husband had died seized and possessed, together with her proportion of the rents received by the executors. James Perrine died in September, 1855, leaving no children or lineal descendants, and possessed of a large estate, including a dwelling-house and several very valuable houses and lots in the city of Mobile. The complainant dissented from the will, within the time required by law, and continued to reside in the

dwelling-house of her husband until the filing of the bill in this case. Decrees *pro confesso* were regularly entered against the devisees and heirs-at-law. The executors answered, admitting all the material allegations of the bill, and the complainant's right to dower, but insisting that her possession of the dwelling-house was a full satisfaction of her claim to back rents. The chancellor appointed commissioners to allot dower to the complainant, and held that she was entitled to one-half of the rents received by the executors from the death of her husband. The only matter here assigned as error is that portion of the decree which relates to the complainant's right to recover rents.

DANIEL CHANDLER, for the appellants.—1. Before the statute of Merton, (20th Henry 3d,) damages could not be recovered at law for the detention of dower, nor rents and profits in equity.—1 Co. Litt. 585; 4 Kent's Com. 65–69. In the United States, wherever this statute has been adopted, it has been construed to give the widow damages, as against the heir, from the death of the husband; and in equity, against the alienee of the husband, from the time the bill was filed, or demand of dower was made.—5 Gill & Johnson, 121; 8 *ib.* 50; 4 Leigh, 495; 5 Monroe, 283; 1 B. Monroe, 199; 2 J. J. Mar. 140.

2. The statute of Merton is not of force in Alabama, because our legislation is inconsistent with it. Our statutes make a much more liberal provision for the widow, and it was intended as a substitute for dower until dower was assigned.—Clay's Digest, 173; Code, § 1359; 14 Ala. 289; 16 Ala. 148; 3 Kelly, 209. This statutory provision is ample and liberal, and governs courts of law and equity alike. There may be occasional hardships in its application to particular cases; but it is a general law, and must receive the same construction in all cases.

JNO. T. TAYLOR, *contra.*—1. It is certainly true that, before the statute of Merton, no damages were given in a proceeding for dower; and for a long time afterwards, at law, only by virtue of that act. The common-law rule

is said to have been founded on the duties which, under the feudal system, were required of the heir as tenant. But, when the rigors of that system gave way, and chancery obtained jurisdiction of dower cases, an entirely different rule was established; and now, in equity, independent of the statute of Merton, the widow is universally held to be entitled to her proportion of the rents accruing from the death of the husband.—4 Kent, 70; 1 Roper on H. and W. 437–55; 2 Dan. Ch. 1344; 28 Miss. 212; 2 Jones' Eq. 357; 2 Bro. Ch. 619; 2 Vesey, 126; 9 Vesey, 222; 4 Leigh, 495; 5 Gill & J. 121; 4 Johns. Ch. 604; 5 Johns. Ch. 482; 1 Bland, 206; 1 Bailey's Eq. 63; 10 Missouri, 746; 1 Hill's Ch. 429; 11 Ala. 32; 12 Ala. 482; 13 Ala. 334.

2. If, however, there is no distinction between a court of law and a court of equity, and the decisions of both are founded on the statute of Merton, then it is confidently insisted, that this statute, though never adopted by legislative enactment in Alabama, is of force here as a part of our common law.—19 Ala. 828; 5 Peters, 233; 8 Pick. 309; 4 Paige, 198; 4 Kent, 472.

3. There is nothing in our legislation inconsistent with the statute of Merton. In England, the statute of Merton and the common-law right of quarantine were never supposed to conflict or interfere with each other; and in the United States, where statutes have been passed similar to our act of 1826, securing to the widow the right to retain possession of the dwelling-house until her dower was assigned, it has never been decided that the right to rents was barred by the statute. The statute is based upon the same necessity which gave rise to quarantine, and was intended as a substitute for that common-law right. When that statute was passed, the widow was entitled to her back rents in all the lands of which her husband died seized and possessed; but, in taking the account of those rents, if she had been in possession of the dwelling-house, she was charged with its rent, and it was deducted from the other rents to which she was entitled. This was thought to be a hardship, since the heir, to whom she was liable in most cases, usually enjoyed the

dwelling-house with her; and therefore, to remedy this evil, it was simply enacted, that the widow should thereafter be entitled to retain the dwelling-house "free of rent." The statute was intended for the benefit of widows; and any construction which would make her liable for the rents, would be violative of its spirit and intent, as well as of its letter. As well might the use of the household furniture, and the corn, grain, &c., consumed by her, be deducted from her distributive share of the personalty.

R. W. WALKER, J.—The only question in this case is, whether the widow of an intestate, who, after his death, and until the assignment of her dower, occupied the place of his last residence, is, when her dower is assigned her, entitled to a third of the rents and profits, which, during the continuance of her possession of the mansion-house, accrued from the other lands subject to her dower.

Lord Coke said, that "three things be favored in law—life, liberty, and dower," (Coke's Litt. 124 *b*); and Lord Bacon speaks of this as "the common by-word in the law."—Reading on Uses, 37. The same idea is thus expressed in Kennedy v. Nedson, 1 Dall. 417: "Dower is a legal, equitable, and moral right, favored in a high degree by the law, and next to life and liberty, held sacred." The language of all the authorities is, that the husband is bound, by the law of God and man, to provide for his wife; and that it is the legal, as well as the moral right of the widow, to derive her support for life out of the husband's estate.—1 Cruise's Digest, title *Dower*, § 6; 1 Story's Eq. 582.

It is not dower itself, however, but the purpose of dower—namely, the support of the widow—which the law favors. And statutes which have for their design the support of the widow out of the estate of the husband, "must be regarded with the same favor, and administered with the same liberality extended to dower; and for the same reason, that the widow is a favorite of the law."—Noel v. Ewing, 9 Indiana, 38.

By the law of England, as it was before the conquest, the widow was permitted to continue a whole year in her husband's house, within which time, if dower was not assigned, she might recover it.—1 Coke's 'Litt. 32 (b.); 4 Kent, 63, note (b.); Den v. Dodd, 1 Halsted, 368. It does not seem to be certain whether or not this continued to be the law after the conquest. But by *Magna Charta* it was provided, that " a widow, after the death of her husband, incontinent, and without any difficulty, shall have her marriage, and her inheritance, and shall give nothing for her dower, her marriage or her inheritance, which her husband and she held the day of the death of her husband; and she shall tarry in the chief house of her husband by forty days after the death of her husband, within which days her dower shall be assigned her, (if it were not assigned her before.) or that the house be a castle; and if she depart from the castle, then a competent house shall be forthwith provided for her, in .the which she may honestly dwell, until her dower be to her assigned, as it is aforesaid; and she shall have in the meantime her reasonable estovers of the common."—1 Statutes at large, p. 4; Coke's 2d Institute, vol. 1, p. 16. The word *estover*, as here employed, according to Lord Coke's explanation of this part of *Magna Charta*, is to be taken for *sustenance*, and comprehends "things that concern the nourishment, or maintenance of man in *victu et vestitu*, wherein is contained meat, drink, garments and habitation."—Coke's 2d Institute, vol. 2, p. 17. See, also, Park on Dower, 250, note (a.)

If during the forty days, or quarantine, as it was called, the heir or tenant of the land put her out, the widow might have her writ *de quarentina habenda*.—1 Coke's Litt. 34 (b.); Park, 250, note (b.) But, although it was the duty of the heir to assign her dower, the widow had no right to tarry in her husband's house, beyond the forty days; and after the expiration of her quarantine, the heir might put her out of possession, and drive her to her suit for dower.—1 Coke's Litt. 34 (b.); 4 Kent, 61–2. The true construction of this part of *Magna Charta*, therefore, was, that the widow shall enjoy her quarantine for forty

days, unless within that time her dower be assigned her. 7 Johns. 249. Although *Magna Charta* declared, that within forty days after the death of her husband, the widow's " dower· shall be assigned unto her "; yet Lord Coke says, and very truly, too, " of little effect was that act, for that no penáltie was thereby provided, if it were not done."—1 Coke's Litt. 32 (*b.*), 34 (*b.*) " And, therefore, to the end that widowes might have certaintie of estate, and that they might enter, and not be driven to suit, the law hath provided dower *ad ostium ecclesiæ* and dower *ex assensu patris.*"—1 Coke's Litt. 34 (*b*); Jackson v. O'Donaghy, 7 Johns. 249.

If the widow's dower was not assigned her during her quarantine, she had her right of action to recover it, and was entitled (when her husband died seized) to have her damages from the day of his death.—1 Coke's Litt. 32 (*b.*); Jackson v. O'Donaghy, 7 Johns. 249; 4 Kent, 63.

In the English law, the right to quarantine, as secured by *Magna Charta,* and the statute of Merton, which gave the widow her damages, from the day of her husband's death, have never been supposed to conflict with each other; and no abatement of her damages was allowed, by reason of her having enjoyed her quarantine, except that in that case the account for rents did not include the rents of the dwelling-house during the time she had occupied the same under her privilege.—See Swain v. Perrine, 5 Johns. Ch. 492–3.

Except where it has been repealed, or superseded by legislation designed as a substitute for it, the provision of *Magna Charta,* securing to the widow her quarantine, is doubtless the law in the several States of the Union, and was in force in Alabama until the passage of the act of 1826, the 5th section of which was obviously meant to take the place of the quarantine privilege as secured by *Magna Charta.*—See 19 Ala. 828.

The right of the widow, as against the heir or devisee, to damages, or mesne profits from the death of her husband, has long been a settled principle of our law. Whether that right exists among us by virtue of the statute of Merton, or by analogy to it, or rests upon the

42

widow's title, we need not inquire: it is enough that its existence is well established.—11 Ala. 32; 13 Ala. 334.

When, therefore, the act of 1826 was passed, the state of our law upon this subject was this: The widow had the right to remain in the mansion-house of her husband, for forty days after his death, and the law made it the duty of the heir to assign her dower within that time; but it imposed no penalty on him, if he failed to do so. The widow's right of possession terminated at the expiration of the forty days, whether her dower had or had not been assigned her; and the heir might then expel her, and drive her to her suit for dower, which, if he were disposed to contest, might result in her being homeless, and without means of support, for a long time before her dower was secured to her. When, however, she did recover her dower. she was entitled to the mesne profits of the same, from the death of her husband, and not simply from the expiration of her quarantine.

By the 5th section of the act of 1826, it was provided, that " It shall be lawful for the widow to retain the full possession of the dwelling-house in which her husband most usually dwelt next before his death, together with the out-houses, offices, or improvements, and plantation thereunto belonging, free from molestation and rent, until she shall have her dower assigned her."—Clay's Digest, 173, § 7. The section of the Code upon the same subject is not materially different.—Code, § 1359.

When we consider the antecedent state of the law, the object of these statutes seems clear. The wife depends upon the husband, during his life; and after his death, the law not only assigns her a portion of his estate, but these enactments, by providing that she may remain in possession of the mansion-house and adjoining plantation, free of rent, until her dower is regularly set apart to her, make it the interest, as well as the duty of the heir, to have it alloted to her without delay. The beneficent purpose of the act is to furnish her a home until that proportion of the estate to which she is legally entitled is settled and received; otherwise, an unfeeling heir might turn her loose upon society, without a house in

which to live, or any means of support, until she may succeed, at the end of a law-suit, in recovering her dower and back rents. Such a recovery would often come too late to mitigate the destitute condition in which she might be placed during the period intervening between her expulsion by the heir, and the allotment of her dower. This view of the statute was expressed in Shelton v. Carroll, 16 Ala. 152. "The object of the statute was, to protect the widow in the enjoyment of the homestead, and the rents and profits accruing therefrom, until her dower was assigned, and to make it incumbent on those entitled to the fee, whether they be the heirs-at-law or purchasers, if they desired to obtain possession of the portion to which they were entitled in the real estate, to become themselves the actors to have the widow's dower assigned her. If they remain inactive, and acquiesce in her possession, she is not subject to the payment of rent, nor to molestation. Until her dower is assigned, she holds the premises for an indefinite period, and may rent them out, and appropriate the proceeds to her own use." So, in Inge v. Murphy, (14 Ala. 291,) it is said: "The object of this act must have been, to provide a support and maintenance for the widow, until her dower should be allotted to her"; and in the same case it is declared, that the very intent of the statute, " is a provision for the widow until her dower is set apart for her." The same view is expressed in Wallace v. Hall.—19 Ala. 372. See, also, Doe ex d. Cook v. Webb, 18 Ala. 814.

It is true, that the common-law quarantine ceased upon the marriage of the widow within the forty days; and that this court, in Shelton v. Carroll, (supra,) held that the widow's right of possession, as established by our statute, was not forfeited by her subsequent marriage. It is also true that in the course of the opinion, and in reference to the widow's right of possession, it is said: "It is but a statutory substitute for dower until it is assigned her, and if the subsequent marriage should work a forfeiture of the one, for the same reason the other should be forfeited also." But it is plain that the real ground for the decision that the widow's statutory quarantine was not forfeited by her

marriage, was, that the humane and enlightened policy of the age precluded the idea that the legislature, in extending the privileges secured to the widow by *Magna Charta*, designed that the rigor of the ancient rule should be applied to these enlarged rights.

The court, in speaking of the widow's quarantine as "but a statutory substitute for dower until it is assigned her," meant no more, as we think, than that the act giving her this right of possession had in view the same object as dower itself, namely, the support of the widow; and that it was intended to accomplish that object, during the period which might intervene between the death of the husband and the assignment of dower.

The statute was designed to supply the defects of the antecedent law, and proceeds upon the idea of *extending* the widow's quarantine as recognized by *Magna Charta*. The provision of the statute is one which the law, in its provident care, has made in consideration of the destitute situation in which the widow is cast upon the death of her husband, and which is likely to continue until her dower is allotted. It never was meant to abridge, but to enlarge her previous rights; and we think that a widow, who has continued in the possession of the homestead, is entitled, when her dower is assigned, and as against the heir or devisee, to share in the rents of all the other real estate subject to her dower, from the death of her husband. If she has occupied the dwelling-house under her quarantine right, the rents of such dwelling-house during the period of her occupancy must, of course, be excluded from the account. Having had the use and enjoyment of the property itself, she cannot demand that the heir shall notwithstanding pay her a third of the rents, or value of the use of the property, during the period of her possession. In the very nature of things, the use of the identical property is a satisfaction of a claim for the rents of the same during such use.

On the other hand, in taking the account of the rents to which the dowress is entitled, it would be manifestly improper to charge her with the rents of the quarantine property during her occupancy; for that would be to

nullify the statute, which secures to her the possession *'free of rent.'*

Statutes similar to, and, in some instances, identical with ours, exist in several of the other States. It has never been considered in any of those States, so far as we have been able to discover, that the privilege conferred upon the widow was designed to be so far a *substitute* for her dower until it is assigned as to destroy her right to a third of the rents which, during the enjoyment of her quarantine, accrued from the other parcels of land subject to her dower. On the contrary, the provision has been uniformly considered as an extension of the common-law quarantine; and notwithstanding the widow has occupied the mansion-house under the statute, she is held to be entitled to her proportion of the back rents of the other parcels of land whereof she is dowable, from the death of the husband. To this effect are McReynolds v. Counts, 9 Grattan, 242, 244; Driskell v. Hanks, 18 B. Monroe, 855, 865; Singleton v. Singleton, 5 Dana, 87, 92; which were decided under statutes identical with ours. See, also, Rambo v. Bell, 3 Kelly, 209, 210; 5 Johns. Ch. 492; Branson v. Yancey, 1 Dev. Eq. 77, 82; Wallis v. Doe, 2 Sm. & M. 220, 224; 5 Monroe, 57; 12 B. Monroe, 407; 1 Lomax' Dig. 91–2; 1 Hill'd R. P. 141–2–3; 2 Rand. 418.

Decree affirmed.